1

2

3

4

5

6

7

8              **UNITED STATES DISTRICT COURT**

9              **EASTERN DISTRICT OF CALIFORNIA**

10

11   LORENZO FOSSELMAN, JR.              )   Case No.: 1:12-cv-01302-DAD-SAB (PC)
                                         )
12                  Plaintiff,           )
                                         )   FINDINGS AND RECOMMENDATIONS
13            v.                         )   REGARDING PARTIES' MOTIONS FOR
                                         )   SUMMARY JUDGMENT
14   D. DIMMER, et al.,                  )
                                         )   [ECF Nos. 44, 46, 59]
15                  Defendants.          )
                                         )
16   _____)

17          Plaintiff Lorenzo Fosselman, Jr. is appearing pro se in this civil rights action pursuant to 42

18   U.S.C. § 1983.  Defendants consented and Plaintiff declined to United States Magistrate Judge

19   jurisdiction; therefore, this matter was referred to the undersigned pursuant to 28 U.S.C. §

20   636(b)(1)(B) and Local Rule 302.[1]

21          Currently before the Court is Defendants' motion for summary judgment, filed June 13, 2016,

22   and Plaintiff's cross-motion for summary judgment, filed June 15, 2016.  (ECF Nos. 44, 46.)

23                                          **I.**

24                                  **RELEVANT HISTORY**

25          This action is proceeding against Plaintiff's Eighth Amendment claim against Defendant

26   Johnson and Plaintiff's First Amendment retaliation claim against Defendant Dimmer.

27   _____

28   [1] Defendants consented to United States Magistrate Judge jurisdiction on September 4, 2012, and Plaintiff declined on
     September 14, 2012.  (ECF Nos. 8, 9.)

                                            1

As previously stated, Defendants filed a motion for summary judgment on June 13, 2016. (ECF No. 44.)  On June 15, 2016, Plaintiff filed a cross-motion for summary judgment.  (ECF No. 46.)

On July 6, 2016, Defendants filed an opposition to Plaintiff's cross-motion for summary judgment.  (ECF No. 49.)  On July 18, 2016, Plaintiff filed an opposition to Defendants' motion for summary judgment.  (ECF No. 50, 51, 52, 53.)

On July 25, 2016, Defendants filed a reply to Plaintiff's opposition.  (ECF No. 56.)  On July 29, 2016, Plaintiff filed a reply to Defendants' opposition.  (ECF No. 57.)

Then, on August 4, 2016, Plaintiff filed a sur-reply to Defendants' reply to his opposition. (ECF No. 58.)  On September 2, 2016, Defendants filed a motion to strike Plaintiff's sur-reply.  (ECF No. 59.)

## II.

## LEGAL STANDARD

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The Court may consider other materials in the record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

In resolving cross-motions for summary judgment, the Court must consider each party's evidence.  Johnson v. Poway Unified Sch. Dist., 658 F.3d 954, 960 (9th Cir. 2011).  Plaintiff bears the burden of proof at trial, and to prevail on summary judgment, he must affirmatively demonstrate that no reasonable trier of fact could find other than for him.  Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  Defendants do not bear the burden of proof at trial and in moving for

1    summary judgment, they need only prove an absence of evidence to support Plaintiff's case.   In re
2    Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010).

3        In judging the evidence at the summary judgment stage, the Court does not make credibility
4    determinations or weigh conflicting evidence, Soremekun, 509 F.3d at 984 (quotation marks and
5    citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party
6    and determine whether a genuine issue of material fact precludes entry of judgment, Comite de
7    Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (quotation
8    marks and citation omitted).

9        In arriving at this recommendation, the Court has carefully reviewed and considered all
10   arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses
11   thereto, if any, objections, and other papers filed by the parties.  Omission of reference to an argument,
12   document, paper, or objection is not to be construed to the effect that this Court did not consider the
13   argument, document, paper, or objection.   This Court thoroughly reviewed and considered the
14   evidence it deemed admissible, material, and appropriate.

### III.

### SUMMARY OF PLAINTIFF'S COMPLAINT

17       At all times relevant Plaintiff was an inmate of the CDCR and was housed at Kern Valley State
18   Prison (KVSP).

19       Plaintiff contends that his rights under the Eighth Amendment were violated when Defendants
20   enforced a policy that required Plaintiff to double cell with other violent prisoners.  (First Am. Compl.
21   5, ECF No. 16.)[2]  Plaintiff contends that he filed numerous appeals regarding the double cell policy.
22   (First Am. Compl. 5.)

23       On February 1, 2008, Plaintiff attended an Institutional Classification Committee ("ICC")
24   hearing where Plaintiff informed prison officials "that if he was further forced to double cell with any
25   inmate incompatible with his Kemetic religious beliefs the inmates['] blood would be on the

---

[2] Citations to Plaintiff's First Amended Complaint will reference the page numbers as electronically docketed, not the page numbers used by Plaintiff.

departments hands." (Decl. of Lorenzo Fosselman ("Fosselman Decl.") ¶ 4, ECF No. 17.)[3]  Initially, Plaintiff was granted single cell status. (Fosselman Decl. ¶ 5.) However, on January 29, 2009, Plaintiff attended another ICC hearing where Defendant Dimmer recommended that Plaintiff be placed on double cell status. (Fosselman Decl. ¶ 6.) Plaintiff argued that sharing a cell with another incompatible inmate would be "a recipe for disaster." (Fosselman Decl. ¶ 6.) Plaintiff filed a grievance challenging the ICC's decision. (Fosselman Decl. ¶ 7.)

At an April 24, 2009 hearing "concerning the issue of the written grievance," Dimmer recommended that Plaintiff be issued a Rules Violation Report ("RVR") and placed in administrative segregation. (Fosselman Decl. ¶ 8.) Plaintiff remained on single cell status while in administrative segregation, pending the hearing on the RVR. (Fosselman Decl. ¶ 9.) Eventually, Plaintiff was found not guilty of the RVR for "threatening an inmate." (Fosselman Decl. ¶ 10.) Plaintiff contends that "it was ... clear that the RVR and ad-seg placement was a reprisal for the grievance Plaintiff wrote regarding the staff deliberate indifference." (Fosselman Decl. ¶ 10.)

Between April 2009 and September 2009, Plaintiff contends that Defendant T. Billings refused to investigate or process Plaintiff's grievances regarding the double celling issue. (Fosselman Decl. ¶ 11.) On June 9, 2009, Plaintiff's housing status was changed to double cell status. (Fosselman Decl. ¶ 12.) Plaintiff was forced to share a cell with another inmate, L. Player. (Fosselman Decl. ¶ 13.) Plaintiff contends that Defendants knew Plaintiff and Player were incompatible and intended them to fight each other. (Fosselman Decl. ¶ 14.)

From the end of 2009 through the beginning of 2010, Plaintiff "went out to court, and was placed on single cell status during the transition." (Fosselman Decl. ¶ 14.) On April 1, 2010, Plaintiff alleges that Defendant Johnson "orchestrated a move to force inmate Davis into the cell with Plaintiff" even though Johnson had mental instability issues. (Fosselman Decl. ¶ 15.) Plaintiff informed Johnson "that due to his spiritual convictions he was not compatible to cell-up with [another] inmate with either mental problems and/or gang affiliation." (Fosselman Decl. ¶ 16.) Plaintiff further

---

[3] Plaintiff filed a declaration at the same time as his First Amended Complaint, which the Court docketed as a separate document from Plaintiff's First Amended Complaint. (ECF No. 17.) The Court  liberally construed Plaintiff's First Amended Complaint as incorporating the allegations made in Plaintiff's declaration.

contends that Davis harbored resentment toward Plaintiff due to Plaintiff's spiritual beliefs and the fact that Plaintiff was previously single-celled.  (Fosselman Decl. ¶ 16.)  Plaintiff was threatened with another trip to administrative segregation if he refused to share a cell with Davis.  (Fosselman Decl. ¶ 16.)  On April 3, 2010, Davis was involved in a physical altercation with Plaintiff, which resulted in Davis being treated for serious injuries.  (Fosselman Decl. ¶ 16.)

Plaintiff continued to file grievances concerning the double cell policy.  (Fosselman Decl. ¶ 18.)  Plaintiff contends that these grievances were improperly screened out by Defendant T. Billings.  (Fosselman Decl. ¶ 19.)

**IV.**

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff moves for summary judgment on the ground that the undisputed material facts clearly demonstrate that Defendant Dimmer wrote a false rules violation report and had Plaintiff placed in administrative–segregation in retaliation for the grievance he wrote on April 6, 2009, in appeal log number KVSP-O-09-00547.  In addition, Defendant Johnson forced Plaintiff to share a cell with inmate Davis, with whom Johnson knew Plaintiff was incompatible.

**A.     Defendants' Evidentiary Objections to Plaintiff's Evidence in Support of Motion and  Opposition**

Defendants raise several evidentiary objections to the evidence submitted by Plaintiff in support of his motion for summary judgment and opposition to Defendants' motion for summary judgment on the grounds that the evidence is inadmissible in its current form and also inadmissible at trial.  It is not the practice of the Court to rule on evidentiary matters individually in the context of summary judgment, unless otherwise noted.  Only the objections to exhibits that are relevant and need to be considered in resolving the instant motions will be addressed below.

///

///

///

///

///

**B.     Plaintiff's Statement of Undisputed Facts[4]**

1.      On at least one occasion prior to arriving at KVSP Plaintiff had single-cell status.

2.      On January 29, 2009, Plaintiff attended an ICC general population review to determine housing classification.

3.      Defendant D. Dimmer was at the hearing on the committee.

4.      Plaintiff provided the committee a document which stated: "For this committee to take away his "S" status at this point, is a recipe for disaster."

5.      During the review on January 29, 2009,t eh committee elected to place Plaintiff on double-cell status.

6.      Plaintiff and inmate Farr were housed together from February 7, 2009, to April 24, 2009.

7.      On April 6, 2009, Plaintiff filed a 602 grievance about the ICC decision to double cell him.

8.      On April 24, 2009, Dimmer interviewed Plaintiff in his office regarding his grievance challenging the ICC's decision to place him on double-cell status.

9.      Dimmer issued Plaintiff a RVR for threatening to kill an inmate in Plaintiff's 602.

10.     On or about June 9, 2009, Lieutenant Richards found Plaintiff not guilty of the offense charged in the RVR, i.e., threatening to kill an inmate.

11.     Plaintiff was housed in administrative segregation from April 24, 2009, until June 9, 2009.

12.     Plaintiff gave Johnson a copy of the 128(b) from IGI indicating he had no gang affiliation two weeks prior to the move with Davis.

---

[4] Defendants object to Plaintiff's statement of undisputed facts in its entirety on the grounds that it fails to "cite the particular portions of any pleading, affidavit, deposition, interrogatory, answer, admission, or other document relief upon to establish that fact," as required by Local Rule 260(a).  Without waiving such objection, Defendants respond to each of Plaintiff's undisputed facts.  Defendants are correct that Plaintiff failed to comply with Local Rule 260(a).  However, in his motion for summary judgment and declaration, Plaintiff sets forth his allegations and includes citations to the record and documentation which he contends support his version of the facts.   Thus, the Court finds that Plaintiff has sufficiently complied with Local Rule 260(a) for purposes of review of his motion for partial summary judgment.

13.     Plaintiff made Johnson aware that he was not compatible with celling up with gang members or individuals with mental problems.

14.     Plaintiff told Johnson that "he and Davis would likely be incompatible."

15.     Plaintiff and Davis were involved in a physical altercation on April 3, 2010.

**C.     Findings on Plaintiff's Motion**

1.     <u>Defendant Dimmer</u>

As previously stated, Plaintiff contends that Defendant Dimmer placed him in administrative segregation because he filed a grievance regarding his double cell status.  With regard to Plaintiff's motion for summary judgment, Plaintiff bears the burden of demonstrating that no reasonable trier of fact could find other than for him.  <u>Soremekun v. Thrifty Payless, Inc.</u>, 509 F.3d at 984.

Allegations of retaliation against a prisoner's First Amendment rights to speech or to petition the government may support a section 1983 claim.  <u>Silva v. Di Vittorio</u>, 658 F.3d 1090, 1104 (9th Cir. 2011); <u>Rizzo v. Dawson</u>, 778 F.2d 527, 532 (9th Cir. 1985); <u>see also</u> <u>Valandingham v. Bojorquez</u>, 866 F.2d 1135 (9th Cir. 1989); <u>Pratt v. Rowland</u>, 65 F.3d 802, 807 (9th Cir. 1995).  "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."  <u>Rhodes v. Robinson</u>, 408 F.3d 559, 567-68 (9th Cir. 2005); <u>Watison v. Carter</u>, 668 F.3d 1108, 1114-15 (9th Cir. 2012); <u>Silva</u>, 658 at 1104; <u>Brodheim v. Cry</u>, 584 F.3d 1262, 1269 (9th Cir. 2009).

In support of his motion, Plaintiff cites to his first amended complaint, his own declaration, the declaration of inmate Lavelle Player, and Defendant Dimmer's discovery responses.  With regard to Defendant Dimmer, Plaintiff declares in pertinent part, the following:

> 2. During the 602 hearing on April 24th, 2009 I asked Dimmer "why was he sending me to the hole, now all of sudden? I am not threatening anyone; I have a celly now that [I] am compatible with.  I am appealing the ICC decision to have my issue heard and protect my rights in case I need to pursue the issue beyond KVSP."  Dimmer responded by saying "he wouldn't send me to Ad-Seg if I dropped the 602 and gave up asking Sacramento for single cell status (S-Status)."

> 3. I refused to voluntarily withdraw[a]l my appeal, and told Mr. Dimmer that I intended to

7

pursue my rights.  It was at this point Dimmer ordered or recommended that I be placed in Ad-seg on S-Status, and issued a RVR because of the grievance.

4.  While I was in Ad-seg Dimmer came to my cell before I was to attend my initial ICC hearing and gave me my first level response to appeal log# O-09-00547, where he denied.  At the door I asked him why did he answer the appeal if he was one of the main decision makers being challenged?  Dimmer responded by telling me, "I do what I want Fosselman, and you do what you're told!"  From that day forward I did not have the privilege to process another appeal at KVSP related to Dimmer or my S-Status.

5.  At my RVR hearing on 5/19/09 heard by Correctional Lieutenant T.L. Richards evidence was collected by Investigate Employee Officer P. Marin [i]t was determined by a preponderance of evidence that I was not guilty and the RVR was dismissed.  While in Ad-Seg all of my property was held in annex, I lost 10 to 12 books, I was stressing and depressed so I lost an additional 10 to 15 pounds, I lost my job as a teacher aid, altogether  I was held in punitive Ad-seg for 49 days due to the retaliatory discipline.

(Pl. Decl. ¶¶ 2-5; ECF No. 47.)

Plaintiff also submits the declaration of inmate Lavelle Player who declares that he believes the administration placed Plaintiff in his cell to set Plaintiff up.   (Pl. Decl., Ex. B; ECF No. 27.) Defendants object to the declaration of Lavelle Player for lack of personal knowledge and as opinion testimony under Rule 602 and 701 of the Federal Rules of Evidence.

Rule 602 provides a witness may not testify unless "the witness has personal knowledge of the matter."  Fed. R. Evid. 602.  A lay witness may testify only as to those opinions or inferences that are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.

Defendants' objection to the declaration of inmate Lavelle Player is sustained.  The declaration does not contain "evidence … sufficient to support a finding that the witness has personal knowledge" of the events at issue in this action, and the declaration of inmate Lavelle Player will not be considered in deciding the cross-motions for summary judgment.

In opposition, Defendant Dimmer argues that Plaintiff has not established a causal connection between his submission of a grievance and his placement in administrative segregation or that Dimmer lacked a legitimate penological reason for placing him in administrative segregation.

///

8

Dimmer does not dispute that he recommended that Plaintiff be placed in administrative segregation following his interview with Plaintiff on April 24, 2009.  Despite Plaintiff's contention to the contrary, Defendant Dimmer declares that he recommended Plaintiff be placed in administrative segregation due to the content of his appeal log number KVSP-O-09-00547 and documents attached to it, including: (1) a statement that Plaintiff had previously made that if he was forced to cell with somebody incompatible with his religious beliefs, he would kill him and the blood would be on CDCR's hands; (2) an affirmation that "his position has not changed" and that making him double-cell is a "health and safety risk;" (3) a document that Plaintiff had apparently submitted previously to the Institutional Classification Committee at Salinas Valley State Prison in which he stated: "if I'm forced by any staff to double-cell with any inmate incompatible with me and my Neterian religious beliefs I will kill him, and the blood will be on the Department's hands;" and (4) a document that Plaintiff had submitted to the Institutional Classification Committee at Kern Valley State Prison, in which he stated that his position outlined in a written statement previously submitted to Salinas Valley State Prison was unchanged, and that for the ICC to take away his single-cell status was "a recipe for disaster." (Dimmer Decl. ¶¶ 7-9, 10, 12-13, Exs. C, D, F; ECF No. 44-3.)   Defendant Dimmer therefore submits that Plaintiff has failed to establish that there is no causal connection between Plaintiff's filing of a grievance and his placement in administrative segregation, and Plaintiff has likewise failed to establish that he lacked a legitimate penological reason for placing him in administrative segregation.

Based on the evidence submitted by Plaintiff and the opposing evidence submitted by Defendant, Plaintiff has failed to demonstrate that no reasonable trier of fact could find other than for him.  Soremekun, 509 F.3d at 984.  Accordingly, the Court recommends that Plaintiff's motion for summary judgment as to Defendant Dimmer be denied.

2.      Defendant Johnson

As previously stated, Plaintiff contends that Defendant Johnson forced him to share a cell with inmate Davis, with whom Johnson knew Plaintiff was incompatible.

To constitute cruel and unusual punishment in violation of the Eighth Amendment, prison conditions must involve "the wanton and unnecessary infliction of pain."  Rhodes v. Chapman, 452 U.S. 337, 347 (1981).  "[A] prison official violates the Eighth Amendment only when two

9

requirements are met.   First, the deprivation alleged must be, objectively, 'sufficiently serious.'" Farmer v. Brennan, 511 U.S. 825, 834 (1994) (citations omitted).  Second, "a prison official must have a 'sufficiently culpable state of mind.'  [Citations.]  In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety."   Id.   A prison official acts with "deliberate indifference" if:

> the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Id. at 837.

In support of his motion, Plaintiff cites to his first amended complaint, his declaration, and the declarations of inmate K. McCombs and K. Armstrong.  Plaintiff declares the following with regard to Defendant Johnson:

> 6.  During the summer of 2009 while housed on D-facility I became aware of inmate Davis whom was housed in the same building I was housed in I saw and heard of at least two physical altercations he was involved in[.]  Upon information and belief one of the altercations escalated into a melee between different Crip factions.  Upon information and belief Davis was moved to another yard where in a short time later he was involved in another fight, every yard [M]r. Davis was moved to at KVSP he was involved in violence these facts were well known to both staff and prisoners … I believe Mr. Davis was also classified as a disruptive group and has documented mental instability issues.

> 7. During the remainder of the summer and fall of 09 I diligently kept submitting my grievances regarding reinstating my S-Status [citation omitted] only to have my efforts frustrated and be ignored by the broken KVSP appeals system.

> 8.  In December of 09 I went out to court for a couple of weeks and returned to KVSP a few weeks later and was housed alone.  During the January 2010, defendant Johnson and I began having problems; as a result it became difficult for me to be let out of my cell on time for showers, phone calls, priority ducats, i.e., law library and chapel services.  Upon information and belief my issues with Johnson became personal because of my spiritual beliefs and sincerity.  On several occasions Johnson had raised questioned about the validity of Ancient Kemetic Sciences and its or[i]gin.  Other prisoners became aware of Johnson hating on me. See: Ex. D and E prisoner declarations.

> 9.  In March 2010, Johnson and I got into a verbal confrontation because I came out of my cell to get some water the officer indicated to me that he wanted me to take it back to my cell instead I kept on walking towards the drinking foundation, at this point Johnson leaned out the window drawed [sic] his block gun weaponary [sic] on me now demanding that I take it back to my cell at that moment, or get shot with the rubber bullets.  I must of became instantly upset

at Johnson threat of excessive force because I called him a House Nigga and walked back to my cell without getting the water.  I overheard Johnson vow to fix me for making the comment.[5]

10.  A week or two before April 1, 2010, Johnson asked me who I celled up with.  I informed Johnson that I prefer to live alone, and that I am not compatible with cell-mates with either gang affiliation or mental inst[a]bility issues.  I then gave Johnson's copies of a 128(b) chrono from IGI, and a [c]hrono from Chaplin Moon identifying me as a Neterian; letting him know I was not a gang member, nor a member of a disruptive group.  [citation omitted]  I then invited Johnson to check my C-file; he responded by telling me that he already had with CCI Herberly, and he knew I double cell eligible so be expecting a celly real soon.  Johnson said that while grinning at me from ear to ear; he also kept possession of the documents as I returned to my cell.

11.  On the morning of 4-1-10, when Johnson opened my door for Davis to come into the cell; I came out, and told Johnson directly that me and Davis would defin[i]tely not be compatible as cell mates.  Johnson in turn gave me the ultimatum to accept Davis or suffer a write up, and go to Ad-seg.

12.  From the moment Davis entered the cell it became a hostile environment; we had nothing in common, nor any type of mutual respect for one another.  On the morning of 4-3-10, I do recall being forced to defend myself; the end result being Davis suffering physical injuries.  In that situation it very well could have been me whom was harmed because of the small size of the cell and lack of supervision, the fact that both he and I have violence in our record added to the mix Davis suffering from psychological issues created a situation where substantial harm to either one of us was likely.  I told at least (3) officers that Davis had to be moved to prevent something from happening Johnson being the first one, and I was told the other staff members I had to wait til Johnson returned to do it; apparently Johnson was the one who made the move happen so none of his co workers wanted to make the move until they talked to him.  See Ex. G Davis's CDCR 7219 medical paper from the incident.

13.  Unfortunately the above situation is common in CDCR on level IV institutions.  Many cell assaults and deaths could be avoided if staff members were not so indifferent to the differences within individuals beliefs and lifestyles; also, if staff were not able to abuse their power through force and intimidation.  Correctional officer's are not able to abuse their power because of the low accountability bar set at KVSP.  I am able to stay this because I wrote appeals prior to and after the incident with Davis that were repeatedly ignored by screen outs.  Since 2010 there have been a multitude of preventable in cell violence.
14.  Last year I became aware that one of my ex cellies Damien Soward was murdered at the hands of a cell mate he was incompatible with and forced to double cell with while confined at KVSP. . .

(Pl. Decl. ¶¶ 6-14; ECF No. 47.) (footnote in original).

---

[5] House Nigga: is a derogatory term used to describe an African American male who buckdances for the man or any system of servitude.

Defendants object to paragraphs 6, 12, 13, and 14 of Plaintiff's declaration for lack of personal knowledge and as opinion testimony under Rule 602 and 701 of the Federal Rules of Evidence. Defendants also object to the declarations and inmates Kyle McCombs and Kurtis Armstrong.  To the extent that the statements offered by Plaintiff and/or fellow inmates are speculative or represent a legal conclusion, the Court, as a matter of course, will not factor that material into the analysis.  See Burch v. Regents of the Univ. of Cal., 433 F.Supp.2d 1110, 1119 (E.D. Cal. 2006) ("[S]tatements in declarations based on speculation or improper legal conclusions, or argumentative statements, are not facts and likewise will not be considered on a motion for summary judgment.  Objections on any of these grounds are simply superfluous in this context."  (citation omitted.)

With respect to Defendants' objections to the declaration of Plaintiff and fellow inmates, "[d]eclarations must be made with personal knowledge; declarations not based on personal knowledge are inadmissible and cannot raise a genuine issue of material fact.  Hexcel Corp. v. Ineos Polymers, Inc., 681 F.3d 1055, 1063 (9th Cir. 2012) (citing Skilsky v. Lucky Store, Inc., 893 F.2d 1088, 1091 (9th Cir. 1990) and Fed. R. Civ. P. 56(c)(4).  "[T]he requirement of personal knowledge imposes only a minimal burden on a witness; if reasonable persons could differ as to whether the witness had an adequate opportunity to observe, the witness's testimony is admissible.  Strong v. Valdez Fine Foods, 724 F.3d 1042, 1045 (9th Cir. 2013) (internal quotations and citation omitted).  Moreover, "personal knowledge and competence to testify … may be inferred from the affidavits themselves," Barthelemny v. Air Line Pilots Ass'n, 897 F.2d 999, 1018 (9th Cir. 1990 (per curiam), and "[u]nfounded speculation as to an affiant's alleged lack of personal knowledge of the events in his affidavit does not render it inadmissible."  Nevada Dept. of Corrections v. Greene, 648 F.3d 1014, 1019 (9th Cir. 2011).

In opposition, Defendants argue that Plaintiff has failed to present evidence to establish that Plaintiff was exposed to a substantial risk of serious harm by sharing a cell with inmate Davis or that Johnson was aware that Plaintiff would be exposed to a substantial risk of serious harm if he and inmate Davis were housed together.

Plaintiff argues that inmate Davis was part of a disruptive group and had mental issues.  Plaintiff has presented no evidence to establish that Davis had any mental illness or was in fact part of

any disruptive group.  In addition, Defendant Johnson declares that he was unaware of any safety issues or concerns related to the housing of inmate Davis and Plaintiff together, and did not know of any specific risk or threat posed by Davis to Plaintiff, or vice versa.  (Decl. of F. Johnson ¶¶ 6, 9; ECF No. 44-2.)  Further, it is undisputed that before Davis and Plaintiff were housed together, they were not enemies, and had never been in a physical, or even verbal, altercation prior to April 1, 2010. (Decl. of R. Nuckles ¶ 4, ECF No. 44-5; Pl. Dep. at 38:19-25, 39:1-7.)  Defendant Johnson also submits the declaration of Sergeant Nuckles who determined that: (1) both Davis and Plaintiff had double-cell status and were double-cell cleared; (2) Davis and Plaintiff were not enemies; (3) housing Davis and Plaintiff together would not present any safety or security concerns; and (4) housing Davis and Plaintiff together would be appropriate.  (Decl. of R. Nuckles ¶ 4.)

Based on the evidence submitted by Plaintiff and the opposing evidence submitted by Defendant, Plaintiff has failed to demonstrate that no reasonable trier of fact could find other than for him.  Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  Accordingly, the Court recommends that Plaintiff's motion for summary judgment as to Defendant Johnson be denied.

**V.**

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants move for summary judgment and argue that the undisputed evidence demonstrates: (1) Defendant Dimmer had a legitimate correctional reason for recommending that Plaintiff be placed in administrative segregation after Plaintiff repeatedly indicated that he might kill any inmate with whom he is forced to share a cell; and (2) Defendant Johnson did not make the decision to house Plaintiff with inmate Davis and, furthermore, was not aware of any risk to Plaintiff posed by celling them together.

///
///
///
///
///
///

13

### A.      Defendants' Statement of Undisputed Facts[6]

1.      During Plaintiff Lorenzo Fosselman's annual review at Kern Valley State Prison on January 14, 2009, the Unit Classification Committee elected to retain him on single-cell status pending review by the Institutional Classification Committee (ICC).

2.      On or about April 6, 2009, Plaintiff submitted an inmate appeal (Log No. KVSP-O-09-00547), in which he challenged the ICC's decision to place him on double-cell status.

3.      In the inmate appeal with Log No. KVSP-O-09-00547, Plaintiff referenced a statement that he had previously made that if he were forced to cell with somebody incompatible with his religious beliefs, he would kill him and the blood would be on the Department's hands.  Mr. Fosselman also advised in the appeal that "his position has not changed" and that making him double-cell is a "health and safety risk."

4.      Along with his appeal with Log No. KVSP-O-09-00547, Plaintiff submitted a written statement that he had apparently submitted previously to the ICC at Salinas Valley State Prison in which Mr. Fosselman stated: "if I'm forced by any staff to double-cell with any inmate incompatible with me and my Neterian religious beliefs I will kill him, and the blood will be on the Department's hands."

5.      Also with his appeal with Log No. KVSP-O-09-00547, Plaintiff included a written statement that he had submitted to the ICC at KVSP, in which he stated that his position outlined in the written statement previously submitted to Salinas Valley State Prison was unchanged, and that for the ICC to take away his single-cell status was "a recipe for disaster."

6.      On or about April 24, 2009, Defendant Dimmer interviewed Plaintiff in connect with KVSP's first level review of his appeal with Log No. KVSP-O-09-00547.

7.      Plaintiff was placed in administrative segregation on April 24, 2009.

---

[6] Plaintiff did not comply with the rules in preparing his opposition to Defendants' motion for summary judgment, including by failing to dispute or admit to the itemized facts in Defendants' Statement of Undisputed Facts.  Local Rule 260(b).  As a result, Defendants' statement of undisputed facts is accepted for purposes of making a determination on the parties' cross-motions except where brought into dispute by Plaintiff's verified complaint, deposition testimony, and verified declarations, signed under penalty of perjury.  See Johnson v. Meltzer, 134 F.3d 1393, 1399-1400 (9th Cir. 1998).  Plaintiff's complaint is verified and functions as a declaration to the extent the allegations are based on personal knowledge of facts admissible in evidence.  Jones v. Blanas, 393 F.3d 918, 922-23 (9th Cir. 2004).

8.     On April 27, 2009, Plaintiff's placement in administrative segregation was reviewed by correctional caption P. Sanchez, who elected to retain Mr. Fosselman in administrative segregation pending review by the ICC because Mr. Fosselman presented an immediate threat to the safety of himself or others.

9.     On May 5, 2009, Plaintiff appeared before the ICC at KVSP for his initial administrative segregation unit review.  The ICC, chaired by the Warden, elected to retain Mr. Fosselman in administrative segregation.

10.    As of April 1, 2010, Plaintiff was double-cell cleared and had double-cell status.

11.    On the morning of April 1, 2010, Sergeant R. Nuckles issued an order assigning inmate R. Davis to cell D4-228, which at the time was being occupied by only Plaintiff.

12.    Sergeant Nuckles issued this order assigning inmate R. Davis to cell D4-228 after having reviewed relevant information from KVSP's system and from each inmates' respective Central Files and determining: (a) both Davis and Plaintiff had double-cell status and were double-cell cleared; (b) Davis and Plaintiff were not enemies; (c) housing Davis and Plaintiff together would not present any safety or security concerns; and (d) housing Davis and Plaintiff together would be appropriate.

13.    Before they were housed together, Plaintiff and inmate R. Davis were not enemies, and had never been in a verbal or physical altercation prior to April 1, 2010.

14.    Plaintiff had the opportunity to reject and not accept inmate R. Davis as a cellmate, but did not reject Davis.

15.    Defendant F. Johnson worked in the control booth in Building D4 on April 1, 2010, from approximately 6:00 a.m. to 2:00 p.m.

16.    Defendant F. Johnson did not work in Building D4 on either April 2, 2010, or April 3, 2010.

///
///
///
///
///

15

**B.     Plaintiff's Proposed Statement of Disputed Facts[7]**

1.     February 1, 2008 ICC made Plaintiff single cell status (S-cell).

2.     At the ICC hearing on 2-1-08, Plaintiff submitted a written statement to ICC giving them notice that if he was further forced to double cell with any inmate incompatible with his Kemetic religious beliefs the blood would be on the department's hands.

3.     Plaintiff was not issued Rules Violation Report (RVR) at SVSP for the written statement to ICC putting the committee on notice of this housing and custody concerns.

4.     On March 6, 2008, Plaintiff submitted appeal log number SVSP-08-1380 concerning the ICC decision on 2-7-08, which made him S-Cell, for clarification purposes and to make a record, this appeal was Granted and exhausted through the IAB on July 3, 2008.

5.     The purpose of the ICC annual reviews among other things is to assess a prisoner's custody status, to determine if he has any known enemies disciplinary issues, etc. the prisoner is encouraged to participate in the hearing and discussion which is what Plaintiff did at his hearing on 2-7-09, 1-14-09 and 1-29-09.

6.     Prior to Plaintiff arriving at KVSP he was S-Cell as a result of the ICC determination on 2-7-08, and the 602 log #SVSP 08-0130 confirmed it.  The written statement given to the ICC was a part of the determination, therefore, all of the information as contained within his central file (C-file).

7.     Plaintiff arrived at KVSP in May of 2008 in General Population and on S-Cell. He attended an ICC which kept him S-Cell.  He had no issues or disciplinary problems or issues with any inmates or staff.  D. Dimmer was at this ICC.

8.     On 114-09 and 1-29-09, Plaintiff was required to appear before ICC for the purpose of housing and custody review.  D. Dimmer was at both of these hearings.  Plaintiff participated and submitted a written statement for the record saying in part "…forcing him to double cell with an

---

[7] In response to Defendants' motion for summary judgment, Plaintiff submits twenty-seven (27) disputed facts. Defendants filed a response to Plaintiff's statement and argue that the facts are either not in dispute, are immaterial to resolving the motion, or argument not supported by evidence.  The Court will not address each of Defendants' response separately, but will address the relevancy and accuracy of any "disputed" facts in the analysis portion of this order, if necessary.  Thus, Plaintiff's statement of disputed facts is set forth only as proposed "disputed facts."

incompatible cell-mate was receipt for disaster." D. Dimmer recommended the ICC to change Plaintiff's housing status from S-Cell to double cell eligible, in spite of the information in his C-file specifically the written statement given to ICC in 2008 at KVSP regarding the blood being on the department's hands, and in spite of the Granted appeal SVSP 08-1380.

9.     Plaintiff disagreed with the ICC decision relying on the information contained in his C-file, also his recorded statements concerning incompatible cell-mates. The ICC determined on that date that he had made no direct threats against possible cellmates. At the conclusion of the hearing Plaintiff was informed of his Appeal Rights.

10.     On or about 2-3-09 Plaintiff voluntarily celled up with Jamescas Farr to whom he was compatible with, and to be in compliance with ICC action.

11.     On 4-6-09, once Plaintiff had all of his supporting documents i.e. 128g chronos, prior granted appeal log #SVSP 08-1380 and iAB 0732805 also his written statements previously submitted to ICC on 2-7-08 and 1-29-09, he filed his 602 appeal challenging the ICC action making him double cell.

12.     Each document attached and or referenced in this appeal log # KVSP-0-09-00547 was information already contained in Plaintiff's C-File and known to both D. Dimmer and the KVSP administration.

13.     On or about 4-24-09, Plaintiff was called to D. Dimmer's office regarding the 602 appeal. During this hearing Dimmer attempted to coerce Plaintiff to withdrawal the 602 or go to the hole. Plaintiff refused to withdrawal the appeal.

14.     As a direct result of Plaintiff's exercising his right to file a 602 challenging the ICC decision to make him double cell, and refusing to withdrawal his appeal, as a reprisal D. Dimmer wrote Plaintiff a false RVR accusing him of threatening an inmate and ordered him placed in Ad-Seg. The alleged threat took place 14 months prior.

15.     Plaintiff never threatened any inmate in his 602, nor in the hearing with D. Dimmer. At the time of his Ad-Seg placement he had a compatible celly Jamesca Farr, whom D. Dimmer never interviewed.

17

16.     Lt. Richards investigated the RVR and dismissed it, finding Plaintiff not guilty by a preponderance of evidence, once it was determined every statement and document referenced was already contained in Plaintiff's C-File and was known to administration prior to the 602.

17.     The CCR states: "any inmate or parolee under the department's jurisdiction may appeal any policy, decision, action, condition, or omission by the department or its staff that the inmate or parolee can demonstrate as having a material adverse effect upon his or her health, safety, or welfare. Also no reprisal shall be taken against an inmate or parolee for filing an appeal.

18.     The CCR had a policy in place for S-Cell, also a policy in place to rehouse a prisoner in Ad-seg for non-punitive investigations.

19.     D. Dimmer's false RVR was a clear indication of a reprisal for the 602.

20.     Inmate Davis was part of a disruptive group and had mental issues.  According to CDCR.

21.     Defendant Johnson had animosity toward Plaintiff.

22.     Plaintiff personally gave Johnson a copy of a 128(b) chrono from IGI indicating that he had no gang affiliation two weeks prior to the move being set up with Davis.

23.      Plaintiff made Johnson aware that he was not compatible celling up with gang members or individuals with mental problems.  Johnson ignored what Plaintiff was trying to tell him about him and Davis not being compatible to cell up together.

24.     Johnson had reviewed Plaintiff's C-File prior to making the move happen with Davis and knew that he was previously S-Cell.  Johnson also knew Davis had been into a number of violent altercations on D-facility, and every other facility he had been housed on.

25.     Plaintiff and Davis were involved in a physical altercation on 4-3-10.  Davis was subsequently treated for injuries.

26.     Dimmer and the KVSP administration tried to have Plaintiff set upon on or about June 14, 2009, when he was required to cell up with L. Player, whom had a long history of what the administration deemed predatory behavior, and whom Dimmer knew Plaintiff would definitely be incompatible with.

27.     Plaintiff's ex-cellmate Damien Soward was unfortunately murdered by a cellmate while housed at KVSP upon information and belief and due to incompatibility issues.

### C.     Defendants' Motion to Strike Plaintiff's Sur-reply

Parties do not have the right to file surreplies and motions are deemed submitted when the time to reply has expired.  Local Rule 230(*l*).  The Court generally views motions for leave to file a sur-reply with disfavor.  Hill v. England, No. CVF05869 REC TAG, 2005 WL 3031136, at *1 (E.D. Cal. 2005) (citing Fedrick v. Mercedes-Benz USA, LLC, 366 F.Supp.2d 1190, 1197 (N.D. Ga. 2005)).  However, district courts have the discretion to either permit or preclude a sur-reply.  See U.S. ex rel. Meyer v. Horizon Health Corp., 565 F.3d 1195, 1203 (9th Cir. 2009) (district court did not abuse discretion in refusing to permit "inequitable surreply"); JG v. Douglas County School Dist., 552 F.3d 786, 803 n.14 (9th Cir. 2008) (district court did not abuse discretion in denying leave to file sur-reply where it did not consider new evidence in reply); Provenz v. Miller, 102 F.3d 1478, 1483 (9th Cir. 1996) (new evidence in reply may not be considered without giving the non-movant an opportunity to respond).

Although the Court did not request nor was Plaintiff granted permission to file a sur-reply, the Court in this instance will exercise its discretion to consider the sur-reply.

### D.     Plaintiff's Objection to Use of Deposition Transcript

On July 18, 2016, Plaintiff filed a separate "objection" to the use of the deposition transcript on the ground that Plaintiff was never given the opportunity to review the contents of the deposition. (ECF No. 52.)  Plaintiff raises a blanket objection the accuracy of facts set forth in the deposition. However, Plaintiff was served with a copy of the excerpts of the portions of the deposition cited by Defendants in response to Plaintiff's statement of undisputed facts.

In his sur-reply, Plaintiff argues that he "wrote an objection to the use of the deposition due to he was no[t] given the opportunity to review the contents prior to its use.  Worth noting is when asked the question 'why do you think he wanted to put you in ad seg?' He answered '[b]ecause of the fact that if my appeal was processed and – he wanted me to drop my appeal, because if my appeal was processed through the third level and the accusations that are made about their administration and budgetary constraints, it would cause trouble.'  When asked the next question did he ask you – excuse

me. 'Did Dimmer ask you to drop your appeal on April 24th?' Plaintiff answered 'I don't recall.' Likely had to do with a miscommunication, or a misunderstanding of the question; which would have been corrected if Plaintiff was given the opportunity to review the contents of the deposition before it being used as evidence."  (Sur-reply at 2, ECF No. 58.)

Federal Rule of Civil Procedure 30(e) permits a deponent to make changes to his deposition testimony "in form or substance" provided the deponent (1) requests review of the deposition to make corrections, (2) signs a statement listing the changes and the reasons for making them, and (3) submits changes within thirty days of receiving notice that the transcript is available.  Fed. R. Civ. P. 30(e)(1)-(2).

Even assuming Plaintiff presented a timely request to review the deposition transcript, his proposed change is not permissible.  Plaintiff's challenge regarding a miscommunication or a misunderstanding would substantially alter Plaintiff's answer which is not permissible.  "Rule 30(e) is to be used for corrective, and not contradictory changes."  Hambleton Bros. Lumber Co. v. Balkin Enters., Inc., 397 F.3d 1217, 1225-26 (9th Cir. 2005).  Any correction to Plaintiff's statement that he did not recall whether Dimmer asked him to drop his appeal on April 24th would be substantive rather than corrective.  The Court finds that Plaintiff's proposed "correction" is a rewrite of his testimony to manufacture an issue of material fact relating to his retaliation claim against Defendant Dimmer. Furthermore, Plaintiff fails to explain how there was a misunderstanding or miscommunication, and merely states in conclusory terms that it "could" have been such.  See also discussion infra section E. Accordingly, Plaintiff's objection to the deposition transcript is without merit.

**E.     Findings on Defendants' Motion**

With regard to Defendants' motion for summary judgment, Defendants need only prove an absence of evidence to support Plaintiff's case.  In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010).

As previously stated, Defendants move for summary judgment and argue that the undisputed evidence demonstrates: (1) Defendant Dimmer had a legitimate correctional reason for recommending that Plaintiff be placed in administrative segregation after Plaintiff repeatedly indicated that he might kill any inmate with whom he is forced to share a cell; and (2) Defendant Johnson did not make the

decision to house Plaintiff with inmate Davis and, furthermore, was not aware of any risk to Plaintiff posed by celling them together.

        1.   <u>Defendant D. Dimmer</u>

       With regard to Defendant Dimmer, Plaintiff contends that Defendant Dimmer placed Plaintiff in administrative segregation because Plaintiff filed a grievance regarding his double cell status.

       Allegations of retaliation against a prisoner's First Amendment rights to speech or to petition the government may support a section 1983 claim.  <u>Silva v. Di Vittorio</u>, 658 F.3d at 1104; <u>Rizzo v. Dawson</u>, 778 F.2d at 532; <u>see also</u> <u>Valandingham v. Bojorquez</u>, 866 F.2d 1135 (9th Cir. 1989); <u>Pratt v. Rowland</u>, 65 F.3d at 807.  "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."  <u>Rhodes v. Robinson</u>, 408 F.3d at 567-68; <u>Watison v. Carter</u>, 668 F.3d at 1114-15; <u>Silva</u>, 658 at 1104; <u>Brodheim v. Cry</u>, 584 F.3d at 1269.

       It is undisputed that Plaintiff had an annual review before a Unit Classification Committee (UCC) on January 14, 2009, during which the UCC elected to retain Plaintiff on single-cell status pending review by the ICC.  (Decl. of D. Dimmer ¶ 4 & Ex. A [Classification Chrono dated January 14, 2009]; ECF No. 44-3.)

       It is further undisputed that Plaintiff's ICC review was held about two weeks later on January 29, 2009.  (Decl. of D. Dimmer ¶ 5 & Ex. B [CDCR 128G Classification Chrono dated January 29, 2009].)  During this review, ICC determined that Plaintiff had been inappropriately placed on single-cell status and, therefore, the ICC cleared Plaintiff for double-cell status.  (<u>Id.</u>)

       It is further undisputed that on April 6, 2009, Plaintiff submitted inmate appeal Log No. KVSP-O-09-00547, challenging the ICC's decision to place him on double-cell status.  (Decl. of D. Dimmer ¶ 6 & Ex. C [Inmate Appeal Log No. KVSP-O-09-00547].)  In this appeal, Plaintiff referenced a statement that he had previously made that if he were forced to cell with somebody incompatible with his religious beliefs, he would kill him and the blood would be on CDCR's hands. (Decl. of D. Dimmer ¶ 7 & Ex. C [Inmate Appeal Log No. KVSP-O-09-00547].)  Further, in the

appeal Plaintiff indicated that "his position has not changed," and that making him double-cell is a "health and safety risk."  (Id.)

Plaintiff submitted a written statement along with this appeal that he had submitted previously to the ICC at another institutional in which Plaintiff stated: "if I'm forced by any staff to double-cell with any inmate incompatible with me and my Neterian religious beliefs I will kill him, and the blood will be on the Department's hands."  (Decl. of D. Dimmer ¶ 9 & Ex. A [Appeal Log. No. KVSP-O-09-00547] attached to Ex. C.)

Plaintiff also submitted a written statement that he had submitted to the ICC at KVSP, in which he stated that his position outlined in the written statement previously submitted to the other prison had not changed, and that if the ICC took away his single-cell status, it would be "a recipe for disaster."  (Decl. of D. Dimmer ¶ 9 & Ex. B [Appeal Log. No. KVSP-O-09-00547] attached to Ex. C.)

On April 24, 2009, Defendant Dimmer interviewed Plaintiff regarding Appeal Log. No. KVSP-O-09-00547, at KVSP's first level review.  (Decl. of D. Dimmer ¶ 10 & Ex. D [First Level Response to Inmate Appeal Log No. KVSP-O-09-00547]; Pl. Dep. at 89:5-21.)

Defendant Dimmer declares that during the interview, he requested that Plaintiff clarify his position as to whether he actually intended to kill his cellmate, or whether it was simply a ploy to obtain single-cell status.  (Decl. of D. Dimmer ¶¶ 10-11, Ex. D [First Level Response to Inmate Appeal Log No. KVSP-O-09-00547] & Ex. E [Supplemental Report of H. Mears]; Pl. Dep. at 92-8-15.)  It is undisputed that Plaintiff refused to answer one way or the other and simply referred to previous documentation.  (Id.)

Based on the information submitted by Plaintiff in his appeal, as well as the personal interview with Plaintiff, Dimmer determined that Plaintiff's presence in the general population threatened the safety of others and endangered the security of the institution, particularly based on his clearance for double-cell status and the possibility he might kill another inmate if housed together.  (Decl. of D. Dimmer ¶¶ 10, 12-13, Ex. D [First Level Response to Inmate Appeal Log No. KVSP-O-09-00547] & Ex. F [Administrative Segregation Placement Notice].)  Based on these concerns, Dimmer recommended Plaintiff be placed in administrative segregation pending further housing review by the

ICC.  (Decl. of D. Dimmer ¶¶ 12-13, Ex. D [First Level Response to Inmate Appeal Log No. KVSP-O-09-00547] & F [Administrative Segregation Placement Notice].)

Plaintiff was placed in administrative segregation on this same day-April 24, 2009.  (Decl. of D. Dimmer ¶ 14, Ex. F [Administrative Segregation Placement Notice].)

On April 27, 2009, Plaintiff's placement in administrative segregation was reviewed by correctional caption P. Sanchez, who elected to retain Mr. Fosselman in administrative segregation pending review by the ICC because Mr. Fosselman presented an immediate threat to the safety of himself or others.  (Decl. of D. Dimmer ¶ 15, Ex. F [Administrative Segregation Placement Notice].)

On May 5, 2009, Plaintiff appeared before the ICC at KVSP for his initial administrative segregation unit review.  The ICC, chaired by the Warden, elected to retain Mr. Fosselman in administrative segregation.  (Decl. of D. Dimmer ¶ 16, Ex. G [CDCR 128G Classification Chrono dated May 5, 2009].)

Defendant Dimmer argues that Plaintiff's retaliation claim against him fails because there is overwhelming evidence, all of which is undisputed, that Dimmer's recommendation that Plaintiff be placed in administrative segregation advanced the legitimate correctional goal of preserving the safety and security of the institution.  Thus, the issue to be determined is whether there was a valid, rational connection between the action taken against Plaintiff and the governmental interest put forward to just that action.  Brodheim, 584 F.3d at 1272-73.

In this instance, Defendant Dimmer has submitted evidence, which is undisputed, that in the same grievance that Plaintiff asserts constitutes protected activity, Plaintiff explicitly stated that he would kill any person with whom he was forced to share a cell if that person were incompatible with his Neterian religious beliefs.  It is also undisputed that when Dimmer interviewed Plaintiff to determine whether Plaintiff actually intended to kill his cellmate or whether Plaintiff simply made the threat as a ploy to get single-cell status, Plaintiff refused to answer.

Plaintiff appears to argue that Dimmer lacked any legitimate correctional goal for recommending his placement in administrative segregation because his threats to kill any inmate with whom he was incompatible were known to Dimmer and others in the months before Dimmer

23

recommended that he be placed in administrative segregation.  Plaintiff specifically references that the threats were known to the ICC on January 29, 2009.

The mere fact that the previous threats were documented by the ICC in January 2009, and Plaintiff was deemed suitable for double-ceiling does not mean that Plaintiff cannot later pose a threat to the institutional security.  That is the case here, in his inmate appeal submitted several months later on April 6, 2009, Plaintiff claimed that he should not have been double-celled, reiterated his previous threats to kill an incompatible inmate, affirmed that his position had still not changed, and stated that the committee chairman's deliberate indifference is "putting CDCR prisoner's [sic] lives at risk [and] must be corrected, before someone is seriously hurt."  (Decl. of D. Dimmer, Ex. C at pp. 12-13; ECF No. 44-3.)

Therefore, irrespective of whether the ICC had believed in January 2009 that Plaintiff was eligible for double-cell status, Plaintiff had given them a clear indication in April 2009 that such determination may have been mistaken.  In light of the substance in Plaintiff's appeal Log. No. KVSP-O-09-00547, it was certainly reasonable for Dimmer to investigate the potential threat during the interview with Plaintiff on April 24, 2009.[8]  Further, as previously stated, during the interview of Plaintiff by Dimmer, Plaintiff refused to affirm that he did not actually intend to kill a cellmate with whom he was incompatible, and it was certainly reasonable for Dimmer to recommend that Plaintiff be removed from the general population and placed in administrative segregation.[9]

In Plaintiff's declaration filed in support of his motion for summary judgment (signed under penalty of perjury-ECF No. 47), and in Plaintiff's opposition to Defendants' motion for summary judgment (not filed under penalty of perjury-ECF No 50), Plaintiff now contends that on April 24, 2009, Defendant Dimmer told him "he wouldn't send me to Ad-Seg if I dropped the 602 and gave up asking Sacramento for single cell status (S-Status)."  (Pl. Decl. in Support of Opp'n ¶ 2.)  However, in

---

[8] Title 15 of the California Code of Regulations, section 3271 states, "[e]very employee, regardless of his or her assignment, is responsible for the safe custody of the inmates confined in the institutions of the department."

[9] See Title 15 of the California Code of Regulations, section 3335(a) (2008) ("When an inmate's presence in an institution's general inmate population presents an immediate threat to the safety of the inmate or others, endangers institution security or jeopardizes the integrity of an investigation of an alleged serious misconduct or criminal activity, the inmate shall be immediately removed from general population and be placed in administrative segregation.")

24

his prior deposition testimony, under penalty of perjury, in response to the question whether Dimmer asked him to drop the appeal on April 24, 2009, Plaintiff responded that he did not recall.  (Pl. Dep. at 90:12-20.)  Further, there is no mention of Dimmer's alleged statement in the first amended complaint or declaration submitted in support of the amended complaint.  (See ECF Nos. 16 & 17.)  To the extent Plaintiff attempts to change his testimony from that given during his deposition and his previous declaration, the supplemental declaration is improper.  A party may not "create [its] own issue of fact by an affidavit contradicting [its] prior deposition testimony." Foster v. Arcata Assocs., Inc., 772 F.2d 1453, 1462 (9th Cir. 1985); see also Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266 (9th Cir. 1991) (district court must make factual determination that the contradiction is actually a "sham.")  "[T]he non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition; minor inconsistencies that result from an honest discrepancy, a mistake or newly discovered evidence afford no basis for excluding an opposition affidavit." Messick v. Horizon Industries, Inc., 62 F.3d 1227, 1231 (9th Cir. 1995) (stating that inconsistencies in a deposition and subsequent declaration that concern "peripheral details" do not preclude consideration of the declaration).

Not only would Defendant Dimmer's statement likely have been clearer in Plaintiff's mind shortly after the incident versus years after the incident, it must be inferred that Plaintiff knew of such alleged statement by Dimmer at the time of filing the complaint and/or his deposition testimony, absent some reason to the contrary.  Plaintiff utterly fails to explain how there was a misunderstanding or miscommunication, and merely states in conclusory terms that it "could" have been such.  (Obj. at 1, ECF No. 52; Sur-reply at 2, ECF No. 58.)  Plaintiff cannot avoid summary judgment, and fails to create a genuine issue of material fact, by contradicting his prior deposition testimony under oath with his later declaration.  The inconsistency goes to the heart of the dispute, and is much more than "peripheral details." Messick, 62 F.3d at 1231.  Indeed, a deponent, such as Plaintiff, may not "alter what was said under oath … A deposition is not a take home examination." Garcia v. Pueblo Country Club, 299 F.3d 1233, 1242 n.5 (10th Cir. 2002) (internal quotation marks omitted).  For these reasons,

the Court declines to consider under the sham affidavit rule the statement attributed to Dimmer in Plaintiff's declaration submitted in support of his motion for summary judgment and opposition.[10]

Plaintiff also attempts to dispute Dimmer's recommendation for administrative segregation placement by referencing the RVR that he received for threatening to kill an inmate.  (Pl. Opp'n at pp. 10-12.)  Plaintiff points out that he was found not guilty of the rules violation and argues that this demonstrates that Dimmer did not have any legitimate correctional goal for recommending that he be placed in administrative segregation.  Plaintiff's argument is without merit.  First, the mere fact that Plaintiff was found not guilty of threatening to kill an inmate during a rules violation hearing that occurred approximately a month later on May 19, 2009, does not establish that Dimmer's recommendation to remove Plaintiff from general population and place him in administrative segregation did not serve a legitimate correctional goal.  Second, in contrast to the interview on April 24, 2009, in which Plaintiff undisputedly refused to answer Dimmer's question and clarify that he did not actually intend to kill a cellmate with whom he was incompatible, Plaintiff did not refuse to respond to this question during the rules violation hearing on May 19, 2009.  (Pl. Decl. to Opp'n at p. 11, ECF No. 47.)

It is unquestionable that institutional safety and security are legitimate correctional goals.  Nevada Dep't of Corr. v. Greene, 648 F.3d 1014, 1018 (9th Cir. 2011) (citing Morrison v. Hall, 261 F.3d 896, 907 (9th Cir. 2001).  Plaintiff's mere speculation that Defendant acted out of retaliation is not sufficient.  Wood v. Yordy, 753 F.3d 899, 905 (9th Cir. 2014).  Indeed, in his opposition Plaintiff speculates that he "believes" Dimmer did not want the inmate appeal "to ever be exhausted because the KVSP ICC made a decision to override a SVSP ICC and IAB decision already rendered classifying Plaintiff S-Cell pursuant to CCR 3377.1(c), if appeal log # KVSP-O-09-00547 reached IAB it would be highly likely that they would re-instate S-Cell; in order to prevent this from happening Dimmer chilled Plaintiff's rights."  (Pl. Opp'n at 6:22-28, ECF No. 50.)  Plaintiff's belief and/or speculation are insufficient to create a genuine issue of material fact.

---

[10] Plaintiff's declaration filed in support of his motion for summary judgment properly lays the foundation needed for the testimony in his declaration but does not resolve the inconsistencies between the deposition and the declaration.  (ECF No. 47.)

Based on the evidence presented, Defendant Dimmer had a legitimate correctional goals (safety of inmate and security of the institution) for recommending Plaintiff be placed in administrative segregation, and the connection between the disciplinary measure taken against Plaintiff based on content of his inmate appeal and interview is neither arbitrary nor irrational. Brodheim, 584 F.3d at 1272-73 (citing Shaw v. Murphy, 532 U.S. 223, 228 (2001)) (quotation marks omitted). To the contrary, there was a valid, rational connection between the actions taken against Plaintiff and the preservation of institutional safety and security. Id. Accordingly, Defendant Dimmer's motion for summary judgment should be granted.[11]

2.   Defendant R. Johnson

Plaintiff alleges that Defendant Johnson housed Plaintiff with a cellmate (Davis) despite knowing that Plaintiff and Davis were incompatible. Plaintiff further alleges that, as a result, Plaintiff and Davis got into a fight.

To constitute cruel and unusual punishment in violation of the Eighth Amendment, prison conditions must involve "the wanton and unnecessary infliction of pain." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). The Eighth Amendment imposes a duty on prison officials to protect inmates from violence at the hands of other inmates. Farmer v. Brennan, 511 U.S. 825, 833 (1994).

"[A] prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be, objectively, 'sufficiently serious.'" Farmer, 511 U.S. at 834 (citations omitted). Second, "a prison official must have a 'sufficiently culpable state of mind.' [Citations.] In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety." Id. A prison official acts with "deliberate indifference" if:

> the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Id. at 837.

---

[11] Because the Court finds that Defendants are entitled to summary judgment on the merits of Plaintiff's claims, there is no need to address entitlement to qualified immunity.

"[E]xtreme deprivations are required to make out a conditions-of-confinement claim." Hudson v. McMillian, 503 U.S. 1, 9 (1992).  Double-celling is not an extreme deprivation.  Inmates in California are double celled by rule with single-cell status being the exception; at the relevant time, prison regulations specifically provided that inmates lack entitlement "to single cell assignment, housing location of choice, or to a cellmate of their choice."  Cal. Code Regs. tit. 15, § 3269 (2009). Accordingly, the denial of single-cell status by itself does not rise to the level of an Eighth Amendment violation.  Rhodes, 452 U.S. at 349.  Furthermore, speculative and generalized fears of harm at the hands of other prisoners do not rise to a sufficiently substantial risk of serious harm to future health.  Williams v. Wood, 223 F.Appx. 670, 671 (9th Cir. 2007) (citing Farmer, 511 U.S. at 843); see also Williams v. CDCR Mental Health, Case No. 1:14-cv-01937-MJS (PC), 2015 WL 1956457, at *3 (E.D. Cal. Apr. 29, 2015) (dismissing failure to protect claims where inmate who attacked plaintiff had informed defendants he would harm himself or someone else if he was taken off suicide watch and returned to the general population); Johnson v. Hicks, No. 1:11-cv-02162-GSA (PC), 2014 WL 1577280, at *5 (E.D. Cal. Apr. 17, 2014) (dismissing failure to protect claim because plaintiff's allegations that his attacker was "well known for in-cell violence" were insufficient to show that inmate posed a "particular present danger" to plaintiff).

Where failure to protect is alleged, the defendant must knowingly fail to protect plaintiff from a serious risk of conditions of confinement where defendant had reasonable opportunity to intervene. Orwat v. Maloney, 360 F.Supp.2d 146, 155 (D. Mass. 2005), citing Gaudreault v. Municipality of Salem, 923 F.2d 203, 207 n. 3 (1st Cir. 1991); see also Borello v. Allison, 446 F.3d 742, 749 (7th Cir. 2006) (defendant's deliberate indifference must effectively condone the attack by allowing it to happen); accord Farmer, 511 U.S. at 833-834 (if deliberate indifference by prison officials effectively condones the attack by allowing it to happen, those officials can be held liable to the injured victim). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstrating in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Farmer, 511 U.S. at 842.

///

### a.      Exposure to Substantial Risk of Serious Harm

Here, it is undisputed that at the time Plaintiff and inmate Davis were celled together on April 1, 2010, Plaintiff had double-cell status and was cleared to have a cellmate.  Furthermore, Plaintiff and Davis were not enemies, and had never been involved in a verbal or physical altercation.

Plaintiff contends that inmate Davis was part of a disruptive group and had mental issues. (Pl.'s Disp. Fact No. 20.)  However, these facts lack foundation and are not supported by admissible evidence.  Plaintiff submits only his opinion that Davis was part of a disruptive group and had mental issues, yet Plaintiff's opinion is not admissible.  Fed. R. Evid. 602, 701.

Although Plaintiff may have believed that the two would be incompatible, there is no evidence that housing inmate Davis in a cell with Plaintiff exposed Plaintiff to a substantial risk of serious harm. While there is certainly a possibility that two inmates might at some point be involved in an altercation, the mere possibility of such does not rise to the level of a substantial risk of serious harm sufficient to violate the Constitution.

### b.      Subjective Awareness of Substantial Risk of Serious Harm to Plaintiff

In order to satisfy the subjective component, Plaintiff must demonstrate that Defendant Johnson was aware of a specific risk to Plaintiff as a result of being celled with inmate Davis.  See Berg v. Kincheloe, 794 F.2d 457, 459 (9th Cir. 1986) ("The standard does not require that the guard or official believe to a moral certainty that one inmate intends to attack another at a given place at a time certain before that officer is obligated to take steps to prevent such an assault.  But, on the other hand, he must have more than a mere suspicion that an attack will occur.")

In this instance, Defendant Johnson submits undisputed evidence that the decision and order to house inmate Davis with Plaintiff was not made by him (Johnson), but by Sergeant Nuckles.  In making his decision, Sergeant Nuckles reviewed all relevant information from KVSP's system and from each inmates' respective Central Files and determined: (a) both Davis and Plaintiff had double-cell status and were double-cell cleared; (b) Davis and Plaintiff were not enemies; (c) housing Davis and Plaintiff together would not present any safety or security concerns; and (d) housing Davis and Plaintiff together would be appropriate.  (Decl. of R. Nuckles ¶ 4.)

///

Defendant Johnson declares that it was his understanding and belief that a higher-ranking official in in Central Control would have, before making the assignment, ensured that Plaintiff and Davis were not enemies and that, based on all relevant information contained in the prisoner's computer system and the inmates' respective Central Files, the housing assignment was appropriate. (Decl. of R. Johnson ¶¶ 5-6.)  Thus, Defendant Johnson declares that he did assign inmate Davis to Plaintiff's cell nor did he have any input in the decision to assign Davis to Plaintiff's cell.  (Id. ¶ 5.)

In opposition, Plaintiff claims that on April 1, 2010, he told Defendant Johnson that he and Davis would be "incompatible," and approximately two weeks prior to being housed with inmate Davis, he informed Johnson that he did not have any gang affiliation.[12]  (Pl.'s Disputed Fact Nos. 22 & 23, ECF No. 53.)  This evidence is insufficient to establish that Johnson was aware of a substantial risk of serious harm posed to Plaintiff as a result of being housed with inmate Davis.

Plaintiff's claim that he and inmate Davis would be "incompatible" or that he did not have any gang affiliations is insufficient to inform Johnson of any specific and/or actual threat to Plaintiff.  See Labatad v. Corrections Corp. of America, 714 F.3d 1155, 1160-61 (9th Cir. 2013) (even though a prison official was aware that inmates of opposite gangs were placed in a cell with each other, such knowledge, without more, fails to satisfy the Eighth Amendment's requirement that an official be aware of a specific risk to an inmate); accord Thompson v. Lee, No. 1:07-cv-01299, 2015 WL 769683, at *8-18 (E.D. Cal. 2015).

In his motion for summary, Plaintiff submits that "he and the Defendant [Johnson] had an anim[us] history in the building, where words, and threats of force were exchanged creating a dislike for one another. [citations omitted].  A week or two prior to Davis moving into his cell Plaintiff presented documents to Johnson from Investigative Gang Unit (IGI) and the Chapl[a]in as he informed him that he was not compatible cell mates with active gang members or prisoners with instability

---

[12] Plaintiff also attempts to claim that Johnson somehow knew of Davis' violent history.  (Pl.'s Disputed Fact No. 24.)  However, there is no evidentiary support for this claim (nor is there admissible evidence establishing that Davis actually had a violent history).  Plaintiff's claim is supported only by his declaration (ECF No. 47), but the declaration does not establish that Johnson knew about Davis' violent history.  Furthermore, any statements to that effect would be speculation, as Plaintiff has not established that he has personal knowledge of what Johnson knew or did not know regarding Davis' history.

issues, during the conversation [J]ohnson informed [Plaintiff] that he was aware of his history from viewing his C-file with CCI Heberly." (Pl.'s Mtn. Summ. J, at 9:2-12, ECF No. 46.)

In his declaration submitted in support of his motion for summary judgment, Plaintiff declares, in pertinent part, "A week or two before April 1, 2010, Johnson asked me who I celled up with. I informed Johnson that I prefer to live alone, and that I am not compatible with cell-mates with either gang affiliation or mental inst[a]bility issues. I then gave Johnson copies of a 128(b) chrono from IGI, and a Chrono from Chapl[a]in Moon identifying me as a Neterian; letting him know I was not a gang member, nor a member of a disruptive group. See Ex. F attached (IGI 128 and Chrono from Chapl[a]in. I then invited Johnson to check my C-file; he responded by telling me that he already had with CCI Heberly, and he knew I was double cell eligible so be expecting a celly real soon. Johnson said that while grinning at me from ear to ear; he also kept possession of the documents as I returned to my cell." (Pl. Decl. ¶ 10, ECF No. 47.)

The fact that Defendant Johnson may have reviewed Plaintiff's central file, knew Plaintiff practiced Neterian, knew Plaintiff was not a gang member or member of a disruptive group, and that he could not be housed with mentally unstable inmates, is nothing more than generalized assertions which insufficient to alert Defendant Johnson to a specific and/or actual threat between Plaintiff and inmate Davis. See Farmer, 511 U.S. at 837 (to be liable for failure to prevent harm, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.) This finding is particularly so because Johnson as the control booth officer does not make any housing decisions because the decisions are made by higher-ranking officials, such as here, the housing determination was done by Sergeant Nuckles. See Leer v. Murphy, 844 F.2d 628, 633 (9th Cir. 1988) (the "inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendants whose acts or omissions are alleged to have caused a constitutional deprivation.") Defendant Johnson declares that he relied on the investigative review conducted by Sergeant Nuckles, and Plaintiff's statements to Johnson that he was "incompatible" with Davis, was not affiliated with a gang, and could not be housed with a mentally unstable inmate, do not demonstrate subjective awareness by Johnson in this instance. The fact that Plaintiff would have preferred a different cellmate is immaterial as it is undisputed that inmates cannot

dictate with whom or where they are housed.  See Cal. Code Regs. tit. 15, § 3269 (2009).

Furthermore, Plaintiff concedes that Johnson did not force him to share a cell with Davis and that he

could have rejected Davis as a cellmate if he chose to do so.  (Decl. of R. Nuckles ¶ 8; Decl. of F.

Johnson ¶¶ 7-8; Pl. Dep. at 47:17-48:16.)  Moreover, it is undisputed that Defendant F. Johnson did

not work in Building D4 on either April 2, 2010, or April 3, 2010.  (Decl. of F. Johnson ¶ 10.)

   Plaintiff has not shown that Defendant Johnson knew of any specific and particular

circumstance and make such inference that housing Plaintiff with inmate Davis posed a substantial

risk of serious harm to his safety.  The simple fact that Plaintiff believed and informed Johnson the

two were not compatible does not demonstrate deliberate indifference.  Based on the evidence

presented, the Court finds that summary judgment should be granted in favor of Defendant F. Johnson.

   In any event, the Court finds that Defendant Johnson would be entitled to qualified immunity

in this instance.

   Qualified immunity is "immunity from suit rather than a mere defense to liability; and like an

absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."  Mueller v.

Auker, 576 F.3d 979, 993 (9th Cir. 2009) (citation and internal quotations omitted).  Qualified

immunity shields government officials from civil damages unless their conduct violates "clearly

established statutory or constitutional rights of which a reasonable person would have known."

Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see also Mullenix v. Luna, 136 S.Ct. 305, 308 (2015).

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have

understood what he is doing violates that right.'"  Mullenix, 136 S.Ct. at 308 (quoting Reichle v.

Howards, 132 S.Ct. 2088, 2093 (2012)).

   The Supreme Court recently cautioned that, when conducting an inquiry into qualified

immunity, courts should not define clearly established law at a high level of generality.  Mullenix, 136

S.Ct. at 308.  "The dispositive question is 'whether the violative nature of *particular* conduct is clearly

established.'"  Id. (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (emphasis in original).

"This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general

proposition.'"  Mullenix, 136 S.Ct. at 308 (quoting Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per

curiam)).

"Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably," Pearson v. Callahan, 555 U.S. 223, 231 (2009), and it protects "all but the plainly incompetent or those who knowingly violate the law," Malley v. Briggs, 475 U.S. 335, 341 (1986).

In resolving the claim of qualified immunity, the Court must determine whether, taken in the light most favorable to Plaintiff, Defendant's conduct violated a constitutional right, and if so, whether the right was clearly established. Saucier v. Katz, 533 U.S. 194, 201 (2001); Mueller, 576 F.3d at 993. While often beneficial to address in that order, the Court has discretion to address the two-step inquiry in the order it deems most suitable under the circumstances. Pearson, 555 U.S. at 236 (overruling holding in Saucier that the two-step inquiry must be conducted in that order, and the second step is reached only if the court first finds a constitutional violation); Mueller, 576 F.3d at 993-94.

As explained above, in this instance, the facts known to Defendant Johnson on April 1, 2010, were that a superior officer had reviewed all relevant information contained in the prison's computer system and Plaintiff's and inmate Davis's central files to determine whether celling them together was appropriate. This investigation revealed that both had double-cell status, they were not enemies, and there existed no safety concerns. Under these circumstances, it would not have been clear to a reasonable officer in Defendant Johnson's position that allowing Plaintiff and Davis to be celled together would have been unlawful. Indeed, prison regulations specifically provide that inmates lack entitlement "to single-cell assignment, housing location of choice, or to a cellmate of their choice." See Cal. Code Regs., tit. 15, § 3269 (2009).

This determination remains the same despite Plaintiff's assertion that he told Johnson that he and Davis would be "incompatible." Lacking specific knowledge of a particular risk to Plaintiff, it would not have been clear to a reasonable correctional officer that "the risk of serious harm was so high that he should have allowed the double-celling or taken some action to prevent the double-celling. See Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1051 (9th Cir. 2002); see also Toscano v. Lewis, No. C-12-5893, 2015 WL 4940832, at *22 (N.D. Cal. 2015) ("A reasonable prison official could reasonably perceive that the inmate's exposure to any risk of harm was not substantial in the

absence of a specific threat…"); Thomas v. Hernandez, No. C 01-4685, 2003 WL 2151870, at *8 ("it would not have been clear to a reasonable official when the risk of harm from housing together two inmates who said they did not want to be housed together but who were not known to the official to be from rival gangs or to pose a particular risk to each other changed from being a risk of some (or even any) harm, to a substantial risk of serious harm to one of those inmates."). Accordingly, Defendant Johnson is entitled to qualified immunity.

## VII.

## RECOMMENDATIONS

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. Plaintiff's motion for summary judgment be denied;

2. Defendants' motion to strike Plaintiff's sur-reply be denied; and

3. Defendants' motion for summary judgment be granted.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

Dated:   **February 17, 2017**

UNITED STATES MAGISTRATE JUDGE